UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re

ANDREW VELEZ CONSTRUCTION, INC.        Case No. 06-12765 (MG)

                Debtor.        Chapter 11

--------------------------------------------------------x


DISCLOSURE STATEMENT IN CONNECTION WITH
PLAN OF REORGANIZATION DATED OCTOBER 21, 2008


Dated: Brooklyn, New York
October 21, 2008

                    Ortiz & Ortiz, L.L.P.
                    Counsel to the Debtor and Debtor-In-Possession
                    127 Livingston Street
                    Brooklyn, New York 11201
                    Tel. (718) 522-1117

# TABLE OF CONTENTS

Page

I. Introduction ........................................................................................... 1

II. Summary of the Plan ........................................................................... 2

III. Background .......................................................................................... 4

    A. Pre-Bankruptcy Events ..................................................................... 4

    B. Post-Bankruptcy Events ................................................................... 6

        1. The Con Edison Adversary Proceeding ....................................... 7

        2. The Con Edison Settlement Agreement ....................................... 8

        3. The Settlement With the Lender .................................................. 9

    C. Debtor's Present Economic Condition ............................................. 10

        1. Assets ......................................................................................... 10

        2. Liabilities ................................................................................... 11

IV. The Chapter 11 Bankruptcy Process ................................................... 13

V. Summary of Classes and Treatment ..................................................... 13

    A. Unclassified Claims .......................................................................... 13

    B. Class 1: Allowed Secured Claim of the Lender ............................... 15

    C. Class 2: General Unsecured Claims ................................................. 15

    D. Class 3: Allowed Interests of the Debtor ......................................... 15

VI. Executory Contracts and Unexpired Leases ....................................... 16

VII. Legal Effects of Confirmation of the Plan ........................................ 16

VIII. Miscellaneous Plan Provisions and Releases ................................... 16

IX. Officers and Directors ........................................................................ 18

X. Implementation of and Distribution under the Plan ............................ 18

    A. The Reorganized Debtor ................................................................... 18

    B. Source of Plan Funding and Feasibility ........................................... 18

    C. Implementation of the Plan .............................................................. 19

    D. Acceptance by a Class of Creditors ................................................. 19

    E. Distribution of Payments under the Plan .......................................... 19

    F. Treatment and Payment of Disputed Claims .................................... 20

XI. Voting and Confirmation of Plan ........................................................ 20

    A. Voting Procedures and Requirements ............................................... 20

    B. Claimants Entitled to Vote ............................................................... 21

    C. Definition of Impairment ................................................................. 21

    D. Vote Required for Class Acceptance ................................................ 21

    E. Disclosure Statement Hearing ......................................................... 22

    F. Requirements for Plan Confirmation ................................................ 22

    G. Acceptance or Cramdown ................................................................ 25

    H. Best Interests Test and Liquidation Analysis ................................... 26

    I. Alternatives to Confirmation of Plan ................................................ 27

        1. Continuation of the Case ............................................................. 28

        2. Alternative Plan of Reorganization ............................................ 28

        3. Conversion of Chapter 11 Case to a Chapter 7 Case.................. 28

        4. Dismissal of Chapter 11 Case .................................................... 29

XII. Tax Consequences of the Plan ........................................................... 29

XIII. Recommendation and Conclusion ..................................................... 30

## I.  INTRODUCTION

Andrew Velez Construction, Inc. ("Debtor"), the above-captioned debtor and debtor-in-possession, submits this Disclosure Statement (the "Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code.  The primary purpose of the Disclosure Statement is to provide the reader with adequate information regarding the Debtor and its Plan of Reorganization (the "Plan") dated October 21, 2008.  Therefore, the Disclosure Statement describes the material terms of the Plan and provides additional important information to assist in reviewing and understanding the terms of the Plan.  A copy of the Plan is annexed as Exhibit 1.

## DISCLAIMERS

Please Read Both the Plan and Disclosure Statement Carefully. This Disclosure Statement is Designed to Assist You in Understanding the Terms of the Plan and Does Not Contain a Description of Every Term of the Plan. Therefore, Your Review of the Disclosure Statement Should Not Be Used as a Substitute for Reviewing the Plan in its Entirety.  For These Reasons, the Plan is Incorporated by Reference Into this Disclosure Statement.

The Disclosure Statement May Not Be Relied upon for Any Purpose Other than to Determine How to Vote on the Plan, and Nothing Contained in it Shall Constitute an Admission of Any Fact or Liability by Any Party, or Be Admissible in Any Proceeding Involving the Debtor or Any Other Party, or Be Deemed Conclusive Advice on the Legal Effects of the Reorganization of the Debtor on Holders of Claims.

No Party Is Authorized to Give Any Information with Respect to Any Matter Other than That Covered by this Disclosure Statement Unless Authorized by the Court. No Representations Concerning the Debtor, the Estate or the Value of its Property Have Been Authorized by the Debtor Other than as Set Forth in this Disclosure Statement. Any Information, Representation or Inducement Made to Obtain Your Acceptance, Which Is Other than or Inconsistent with the Information Contained in this Disclosure Statement And/or in the Plan, Should Not Be Relied Upon by Any Creditor in Voting on the Plan.

This Disclosure Statement Contains a Summary of Certain Provisions of the Plan. The Debtor Has Made Every Effort to Be Accurate in its Summary of the Plan and the Estimates Provided Herein. However, Such Summaries Do Not Purport to Be Complete and Are Qualified to the Extent That They Do Not Set Forth the Entire Text of the Plan. Each Holder of a Claim Should Review the Entire Plan Before Casting its Ballot.

The Purpose of this Disclosure Statement Is to Provide Creditors with Adequate Information to Enable Them to Make an Informed Judgment Respecting the Plan. Approval by the Bankruptcy Court of this Disclosure Statement Should Not Be Viewed as a Determination with Respect to the Merits of the Plan.

## II. SUMMARY OF THE PLAN

As further described in the Plan and below, the Plan provides that the Reorganized Debtor will pay all or a portion of the Allowed Claims, assume any ongoing obligations of the Debtor that have not been extinguished by the Plan, and continue to operate as a general contractor. Under the Plan, the claims of the Debtor's Professionals will be paid a portion of their claims on or before the Effective Date or on any later date that is agreed to the holders of those claims. The Lender Secured Claim (defined below) will be paid in full. Unsecured creditors will receive pro rata distribution of $25,000 from the Settlement Funds. The interests of the Debtor's shareholders, Mr. And Mrs. Andrew Velez, will remain unchanged.

As discussed in greater detail below, the Debtor's bankruptcy filing was caused by the difficulties the Debtor experienced with a construction project (the "Project") it performed for the Consolidated Edison Company of New York, Inc. ("Con Edison"). When the Debtor filed its bankruptcy petition, the income generated by the Project constituted over 90% of the Debtor's revenue. The Debtor's involvement with the Project terminated soon after the bankruptcy case was filed and the Debtor has been unable to generate any significant revenue while is has been a debtor in bankruptcy.

Given the difficulty the Debtor has had in obtaining and performing under new contracts while it was under the Bankruptcy Court's protection, the only source of income the Debtor has available to fund the Plan is the proceeds of a lawsuit settlement (the "Settlement

Funds") the Debtor reached with Con Edison. For this reason, and the reasons stated below, the Debtor believes the Plan represents the best – if not the only – means for paying creditors. As discussed in greater detail below, the Plan provides a greater payment to creditors than they would receive if the Debtor was forced to shut down, sell all of its assets, and distribute the proceeds of that sale.

Debtor's Counsel has retained $175,000 of the Settlement Funds in escrow. Those funds will be distributed under the Plan as follows:

| | |
|---|---|
| Debtor's Professionals: | $75,000 |
| Secured Claim of Lender | $75,000 |
| Unsecured Creditors | $25,000 |

A very important cornerstone of the Plan is the reduction in claims by the Debtor's two largest creditors, Con Edison and the New York National Bank (the "Lender")[1], and the Debtor's Professionals. Con Edison filed a claim against the Debtor for over $18,000,000. However, it has agreed, as part of the Plan, not to seek any payment of its claim and does not oppose the Plan. In addition, the Lender has agreed to settle the amount of its secured claim against the Debtor and support the Plan. Finally, the Debtor's Professionals – its lawyers and accountants – have agreed to waive their right to full payment of their fees when the Plan is approved so that unsecured creditors may share in the Settlement Funds. Without these agreements, the Debtor believes the Settlement Funds would not be available to pay unsecured

---

[1]Bank Hapoalim, City National Bank of New Jersey, and the Business Consortium Fund entered into a participation agreement with the Bank that provides each lender with a percentage interest in the Loan. All four participants are referred to as the "Lender."

creditors.

**THE DEBTOR URGES YOU TO READ THE PLAN AND THE REMAINDER OF THE DISCLOSURE STATEMENT SO THAT YOU MAY DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN. THE DEBTOR NEEDS YOUR VOTE TO APPROVE THE PLAN. IT IS CONFIDENT IF YOU REVIEW THE DISCLOSURE STATEMENT AND PLAN, YOU WILL FIND THAT VOTING TO ACCEPT THIS PLAN IS THE BEST AND ONLY MEANS FOR ASSURING THAT YOU RECEIVE SOME RECOVERY OF YOUR CLAIM**.

## III. BACKGROUND

The Debtor is a privately-owned construction company owned by the Velez family that has operated for over 35 years.  The Debtor believes it is the largest minority-owned contractor located in New York City.

A. <u>Pre-Bankruptcy Events</u>

On or about October 4, 2001, the Debtor entered into a contract to serve as the general contractor for a large construction project with the Con Edison.  The contract, known as Purchase Order No. 128355 (as modified and supplemented from time to time, the "Contract"), provided that the Debtor would furnish certain work, labor, supervision, services, materials and equipment, and act as the general contractor, to renovate and reconstruct certain property located on Third Avenue in Brooklyn, New York.  The Contract was modified by, among other things, the Modification Implementing Settlement and Release dated June 29, 2006 ("Modification Agreement").  The Project was the largest construction project

undertaken by the Debtor as a general contractor. The Switzer Group, Inc. ("Switzer") performed architectural services in connection with the Project.

After entering into the Contract, the Debtor obtained a revolving line of credit loan (the "Loan") from the Lender in the principal amount of $1,500,000.00. The Lender renewed and extended the Loan in 2002, 2003, and 2004. The Debtor's president guaranteed the Loan. To secure its obligations under the Loan, the Debtor granted the Lender a continuing general security interest in, and an assignment of, the proceeds of the Contract. In September 2005, the Loan was modified to extend its maturity date, interest rate, and payment terms. At that time, the Debtor also granted the Lender a security interest in all of its personal property. The Lender asserts that, as of the Petition Date, approximately $588,000 was due from the Debtor on account of the Loan.

The Debtor began to experience cash flow difficulties after commencing work on the Project. Moreover, the Debtor and Con Edison had numerous disputes over the progress of the Project, monies due to the Debtor under the Contract, and over other issues. The Debtor attributed some of the difficulties it experienced in connection with the Project to the services rendered by Switzer.

The Project was to be completed in 2006. At that time, the revenues generated by the Project accounted for over 90% of the Debtor's income. By 2006, the Debtor faced an insurmountable cash flow problem that prevented it from timely paying its suppliers and subcontractors. The Debtor's president attempted to keep the Project moving forward by loaning the Debtor over $600,000 to meet operating expenses.

In an attempt to resolve certain ongoing disputes, the Debtor and Con Edison entered into the Modification Agreement in July 2006.  Among other things, the Modification Agreement contained mutual releases and waivers of virtually all of the claims held by either party against the other.  The Modification Agreement also extended the Project completion date and provided for the release of certain funds by Con Edisonto the Debtor.

However, even after the release of such funds, the Debtor was unable to cure the shortfalls that had accrued.  By September 2006, the work performed on the Project came to a stop because of the delay in paying suppliers and subcontractors.  The Debtor filed a voluntary chapter 11 petition on November 22, 2006.

B.  Post-Bankruptcy Events

Approximately three weeks after the Petition Date, Con Edison moved to, among other things, compel the Debtor to assume or reject the Contract.  The Contract was rejected as of January 31, 2007. Con Edison engaged a replacement contractor to complete the Project.  Con Edison informed the Debtor that it satisfied some of the mechanics' liens filed against the Project and took an assignment of the claims of the holders of those liens. Thereafter, Con Edison filed a proof of claim against the Debtor asserting more than $18 million due from the Debtor for, among other things, the cost of completing the Project.

The Debtor's business was greatly impacted by its bankruptcy filing.  Its ability to secure new jobs was impeded by its debtor-in-possession status.  Although the Debtor was invited to bid upon a number of significant projects, it could not secure any significant projects and does not believe it can do so until it emerges from Chapter 11.  This adverse impact has caused the Debtor to experience significant cash flow difficulties.

The Debtor's poor economic situation has been exacerbated by the fact that the two projects upon which the Debtor depended for post-bankruptcy revenue – the Yankee Stadium project and the renovation of the Jacob Javitz Center -- have not proceeded as planned and have been stalled.

1. The Con Edison Adversary Proceeding. On or about June 5, 2007, the Debtor commenced a lawsuit (the "Adversary Proceeding") against Con Edison and Switzer (collectively, the "Defendants"). The Debtor asserted a variety of causes of action against each Defendant and sought substantial damages. Each Defendant filed an Answer in the Adversary Proceeding. Con Edison asserted counterclaims against the Debtor, and Switzer asserted cross claims against Con Edison. Two motions to dismiss the complaint and the amended complaint were filed by Con Edison; a number of counts in the complaint were dismissed by the Court.

One of the causes of action brought against Con Edison was based upon the Debtor's assertion that the Modification Agreement constituted a constructively fraudulent conveyance that should be set aside. In summary, the Debtor asserted that (a) the value of the claims it had waived and released pursuant to the Modification Agreement was disproportionate to the consideration paid by Con Edison, and (b) the Debtor had been insolvent when it waived and released those claims. Con Edison vigorously disputed this argument on a number of grounds, including an assertion that the consideration it had paid under the Modification Agreement was adequate and reasonably equivalent to the benefits it received.

The fraudulent conveyance causes of action were vital to the success of the Adversary Proceeding because most of the claims that formed the basis of the damages sought by the Debtor were the same claims that had been waived and released under the Modification Agreement. Accordingly, if the Modification Agreement were upheld as valid, most of the Debtor's other claims would have been automatically dismissed.

Con Edison and the Debtor attempted unsuccessfully to mediate their dispute in early 2008. The Debtor and the Defendants settled their disputes and entered into a stipulation and settlement agreement that was approved by the Bankruptcy Court on August 15, 2008 ("Settlement Agreement"). A copy of the Settlement Agreement that was approved by the Bankruptcy Court is annexed to the Plan as Exhibit A.

2. <u>The Con Edison Settlement Agreement</u>. The Settlement Agreement is the cornerstone of the Plan. As discussed in greater detail below, the Debtor experienced significant economic difficulties after the Petition Date because most of its potential customers would not award a contract to a debtor in possession. In addition, because of the Debtor's debtor-in-possession status, its costs to insure a new job were prohibitive. The Settlement Agreement provides the following:

– Con Edison agreed to pay the Debtor $285,000 (the "Settlement Funds") for a mutual release of all claims and dismissal, with prejudice, of the Adversary Proceeding;

– The Debtor agreed to use the Settlement Funds to meet immediate operating expenses and to fund a plan of reorganization that would allow it to emerge from the bankruptcy court's protection. The Settlement

Agreement set forth the following suggested distribution of the Settlement Funds under a plan of reorganization: $75,000 would be used to pay the Debtor's Professionals; $110,000 would be used for the Debtor's immediate operational needs; $75,000 would be used to satisfy the Secured Claim of the Lender; and $25,000 would be used to pay unsecured creditors.

– The Debtor agreed that any plan it filed would provide for releases of Con Edison to be granted by all entities receiving distributions under such plan and an injunction prohibiting any such parties from bringing any claims or causes of action against Con Edison;

– Con Edison agreed to waive its right to receive a distribution under the plan;

– The Debtor and Switzer agreed to mutual releases.

The Court approved the Settlement Agreement on August 15, 2008. Debtor's Counsel is holding the Settlement Funds in escrow, less the $110,000 provided to the Debtor for operating expenses.

3. <u>The Settlement With the Lender</u>: The Debtor and the Lender have engaged in months of negotiations over the amount due to the Lender and the classification of the Lender's Secured Claim. After completing those negotiations, the Debtor does not dispute the principal pre-petition amount asserted by the Lender. However, it disagreed with the Lender's assertion that its pre-petition lien extended to the Settlement Funds.

The Lender asserted, among other things, that the Settlement Funds constituted the proceeds of the Contract and are subject to the Lender's lien. The Debtor asserted, among

other things, that the Settlement Agreement settled the types of claims, such as a fraudulent conveyance claim and a defamation claim, that are not subject to a lender's pre-petition lien. The Debtor does recognize, however, that the Lender may have a viable lien against the accounts receivable that have not been collected by the Debtor. For these reasons, the Debtor and the Lender have agreed settle their dispute and to fix the amount of the Lender's secured claim as $75,000.00. This amount generally represents an acknowledgment that the Debtor may have approximately $50,000 in receivables that are collectable and that the Bank may have some interest in the Settlement Funds. A copy of the Debtor's Liquidation Analysis, demonstrating that the Debtor would most likely collect no more than $53,000 in accounts receivable, is annexed as Exhibit 2. The Lender and the Debtor are negotiating a stipulation that resolves this dispute that will be submitted to the Court for its approval.        The Debtor's settlement with the Lender is another cornerstone of its Plan. At the present time, the Debtor's operations are too small to provide a payment to creditors, other than its professionals, beyond the Effective Date. By accepting a portion of the Settlement Funds as payment in full, the Lender has enabled the Debtor to attempt to re-ignite its operations post-confirmation and possibly remain in business. The Lender supports the Plan.

<p style="text-align:center">C.  <u>Debtor's Present Economic Condition</u></p>

1.  <u>Assets</u>:  As stated above, when the Debtor filed its bankruptcy petition, almost all of its revenues stemmed from the Project. On the Petition Date, the Debtor had a small number of other projects that had been completed, or were near completion, and was negotiating new projects. Since the Debtor sells its

contracting and construction management services, it does not have any valuable assets that are not the subject of the Lender's Lien, other than the Settlement Funds.

On the Filing Date, the Debtor's assets consisted of the cash it had in its bank accounts, office furniture and equipment, its account receivables (money due from customers), and its claim against Con Edison. As set forth in the Debtor's amended schedules, filed with the Court on May 31, 2007, the Debtor's assets on the Petition Date consisted of the following (in rounded numbers):

| | |
|---|---|
| Real Property: | None |
| Personal Property: | |
| Cash in various accounts: | $11,000 |
| Security Deposit: | $11,000 |
| Claims against Con Ed | $6,500,000 |
| Accounts Receivable | $451,000 |
| Car Leases | Value, if any, unknown |
| Office Equipment | $2,500 |

After the Petition Date, the Debtor did not acquire any valuable assets. Moreover, the value of its receivables has diminished because the Debtor has either used monies collected from its customers during the ordinary course of its business or determined that such funds are not collectible.

2. <u>Liabilities</u>: Most of the claims asserted against the Debtor arose as a result of the Project or during the performance of other contracts. After the petition date,

the Debtor obtained a bar date order from the Court that fixed the last date for filing proofs of claims. Based upon proofs of claim filed with the Court and the Debtor's schedules, the following pre-petition liabilities have been asserted against the Debtor (in rounded numbers):

| | |
|---|---|
| Secured Debt | $588,000 |
| Unsecured Debt Project Claims (Unpaid) | $872,000 |
| Project Claims (Paid by Con Ed) | $1,500,000 |
| Non-Project Claims | $2,950,000 |
| Con Edison Claim | $18,000,000 |

Since the bankruptcy case was filed, the Debtor has generally paid its ongoing liabilities as they became due. This has been accomplished, in large part, to loans provided to the Debtor by its shareholder Andrew Velez. The Debtor is unaware of any post-petition obligations, other than the fees incurred by the Debtor's Professionals, that have arisen after the Filing Date that have not been paid, or are not in the process of being paid in the ordinary course of the Debtor's business. The Debtor anticipates that the aggregate amount of post-petition professional fees incurred by the Debtor's Professionals will exceed $300,000.00. However, the Debtor's cash flow difficulties are such that the Debtor is not able to pay its post-petition professional fees in full. The Settlement Funds are the only source of income that Debtor has to fund a plan of reorganization and pay its professionals fees. Therefore, the Debtor's ability to confirm any plan of reorganization is dependent

upon the willingness of its professionals to waive their entitlement to be paid in full prior to confirmation of such a plan.

## IV.  THE CHAPTER 11 BANKRUPTCY PROCESS

Chapter 11 is the chapter of the Bankruptcy Code that permits an individual or business to reorganize its economic affairs.  The Debtor commenced its Chapter 11 Case on November 22, 2006 (the "Filing Date") by filing a petition for relief under Chapter 11 with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

A plan of reorganization effectively restructures a debtor's liabilities and provides for their payment.  In exchange for the payments set forth in the plan, the debt is deemed satisfied in full. Creditors vote to accept or reject a plan of reorganization.  Therefore, the ultimate goal of a Chapter 11 debtor is to obtain its creditors' approval of a plan of reorganization.

## V.  SUMMARY OF CLASSES AND TREATMENT

Under the Plan, Claims against the Debtor are divided into Classes according to their similarity with other Claims and their relative legal and contractual priorities as determined by the Bankruptcy Code.

A.  <u>Unclassified Claims</u>.  In accordance with mandatory provisions of the Bankruptcy Code, the Plan provides that holders of certain unclassified Claims known as Administrative Claims will be entitled to payment from the Settlement Funds and Cash on or before the Effective Date or on such dates that such Claims become Allowed Claims.  In this case, such claims consist of the professional fees incurred by the Debtor's

Professionals, and any other obligations that have arisen after the Filing Date that were incurred by the Debtor in the ordinary course of the Debtor's business.

The Bankruptcy Code requires that administrative claims be paid in full as a condition to the Bankruptcy Court's approval of the Plan unless the holders of these claims agree to different treatment. For this reason, the Debtor can not obtain the Court's approval of the Plan unless the Debtor's Professionals agree to different treatment of their claims than is provided in the Bankruptcy Code.

To support the Debtor's reorganization, the Debtor's Professionals have agreed to accept a partial payment of their fees from the Settlement Funds on or before the Effective Date and the remainder after confirmation of the Plan to permit the Debtor to confirm the Plan. If there are any other Unclassified Claims, such as United States Trustee Quarterly Fees, they will be paid in full on the Effective Date.

After the Petition was filed, the Debtor faced serious economic difficulties and struggled to maintain operations. Much of its resources were dedicated to pursuing its claims against Con Edison. Moreover, because the Debtor was under the protection of the Bankruptcy Court, it found that many customers refused to award bids to a debtor-in-possession. In order to keep the Debtor in business during this time, President Andrew Velez loaned the Debtor approximately $328,000 to meet payroll and operating expenses. None of the funds loaned by Andrew Velez were used to pay officer compensation. Mr. Velez has not and shall not seek reimbursement of these loans under the Plan.

B.  <u>Class 1</u>:  Allowed Secured Claim of the Lender.

For the reasons set forth above, the Debtor and the Lender have agreed that the Secured Claim of the Lender shall be deemed an Allowed Claim in the amount of Seventy-Five Thousand Dollars ($75,000.00).  The Lender shall receive the sum of Seventy Five Thousand Dollars ($75,000) from the Settlement Funds on or before the Effective Date in full satisfaction of the Secured Claim of the Lender.

C.  <u>Class 2</u>:  General Unsecured Claims.

In full and final satisfaction of all Allowed General Unsecured Claims, each Claimant in Class 2 shall receive a pro rata distribution of Twenty-Five Thousand Dollars ($25,000) of the Settlement Funds on the Effective Date or as soon thereafter as practical.  The remainder of the Lender's claim shall be deemed the Unsecured Claim of the Lender and shall be deemed an Allowed Claim in the amount of Five Hundred and Thirteen Thousand One Hundred and Eighty Two Dollars ($513,182.00).  The Unsecured Claim of the Lender is a General Unsecured Claim.

Andrew Velez loaned the Debtor over $600,000 prior to the Petition Date and asserts an unsecured claim against the Debtor.  He shall not receive any payment from the Debtor of any kind, will not share in the pro rata distribution of the Settlement Funds, and will not vote on the Plan.

D.  <u>Class 3</u>:  Allowed Interests of the Debtor.

The Debtor's shareholders shall retain their respective interests in the Debtor and the Reorganized Debtor. Their legal and equitable rights shall not be altered, changed, or modified except as provided in the Plan.

## VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

At the present time, the only lease or executory contracts that have not been assumed or rejected by the Debtor are its car leases and its leases for office equipment. The Debtor intends to assume these leases.

## VII. LEGAL EFFECTS OF CONFIRMATION OF THE PLAN

Article VIII of the Plan provides in relevant part that the rights afforded in the Plan shall be in exchange for and in complete satisfaction of all Claims of any nature whatsoever against the Debtor. This discharge applies to all Claims, whether or not such Claim is Allowed, and whether or not a Claimant votes on the Plan. In addition, the Plan provides that title to the Debtor's property shall vest in the Reorganized Debtor.

In addition, Article IX of the Plan provides that the Bankruptcy Court's Confirmation of the Plan serves as a permanent injunction against the commencement of any action of any kind with respect to any Claim against the Debtor or the Reorganized Debtor, its past or present agents, or Property of the Debtor or the Reorganized Debtor that does not conform to or comply with the provisions of the Plan. The injunction does not apply to the holder of a timely filed Claim to which the Debtor has timely filed an objection or enjoin or prohibit the enforcement by any Claimant of any of the obligations of the Debtor or the Reorganized Debtor under this Plan.

## VIII. MISCELLANEOUS PLAN PROVISIONS AND RELEASES

The Plan provides for the procedures to be followed in the event an objection is made to the allowance any Claim. See Plan Article XII. Other miscellaneous provisions of

the Plan relate to the retention of jurisdiction by the Bankruptcy Court (Article XV); Withdrawal, Revocation, Modification, or Amendment of Plan and the law governing the Plan (Article XVII).

Releases:   The Plan also provides a release of claims against Con Edison by both the Debtor and any party receiving funds under the Plan.  In addition, the Plan provides that any party receiving funds under the Plan will preclude that party from asserting a claim or a lawsuit against Con Edison arising from the Project.  Therefore, approval of the Plan would not only discharge Claims against the Debtor, it would result in a release against Con Edison for any claims or causes of action that existed prior to the Petition Date.  The Debtor believes that such a release and injunction in favor of Con Edison is warranted and supported by applicable case law because all of the funds used to pay creditors under the Plan were provided by Con Edison.

The Debtor agreed to such a release because the Debtor could not confirm a Plan without Con Edison's financial contribution and its approval of the Plan.  Moreover, there would be no payment to unsecured creditors without that financial contribution or Plan support.  In addition, Con Edison paid over One Million Dollars ($1,000,000.00) in claims filed against the Project that were claims asserted against the Debtor.  By satisfying those claims, Con Edison reduced the number of claims against the Debtor and the Estate.  As a result, the remaining creditors shall receive a greater recovery as a result of the smaller creditor pool.  For these reasons, the Debtor believes that the release provided Con Edison is appropriate under the circumstances of this case and the applicable legal authority.

## IX. OFFICERS AND DIRECTORS

Andrew Velez is the president and majority shareholder of the Debtor. Elizabeth Velez, Andrew Velez's daughter, is the vice-president of the Debtor. Mrs. Lois Velez is the Debtor's secretary. These individuals shall retain theses positions with and interests in the Reorganized Debtor. At the present time, Andrew's salary is $119,600, Elizabeth's annual salary is $75,000, and Lois's annual salary is $22,100. The Debtor does not intend, at the present time, to increase these rates of compensation after the Plan is confirmed for the following twelve months. Moreover, the Debtor only pays officer salaries when there are sufficient funds on hand to make those payments.

## X. IMPLEMENTATION OF AND DISTRIBUTION UNDER THE PLAN

A. <u>The Reorganized Debtor</u>

As of the Effective Date, the Reorganized Debtor shall continue the operations of the Debtor as a for-profit corporation and retain its Property. The Reorganized Debtor will assume the obligations of the Debtor that are not discharged under the Plan, including the obligation to make distributions under the Plan.

B. <u>Source of Plan Funding and Feasibility</u>

The Plan provides for a single payment of Plan payments on the Effective Date from the Settlement Funds to the Secured and Unsecured Creditors. The payments to be made to the Debtor's Professionals shall be made from the Settlement Funds and from the Reorganized Debtor after the Effective Date.

C.  Implementation of the Plan

Each Impaired Class is entitled to vote separately.  The Plan provides that the
holders of Claims that are impaired and are entitled to vote as a Class may vote to accept or
reject the Plan. No distribution of Cash or other property shall be made to the Class 3
interest holders: they will retain their interest in the Debtor and Reorganized Debtor.

D.  Acceptance by a Class of Creditors

Consistent with Section 1126(c) of the Bankruptcy Code and except as provided in
Section 1126(e) of the Bankruptcy Code, a class of Claims shall have accepted the Plan if the
Plan is accepted by at least two-thirds in dollar amounts and more than one-half in number of
holders of the Allowed Claims of such Class that have timely and properly voted to accept or
reject the Plan.

E.  Distribution of Payments under the Plan

Payments to Claimants with Allowed Claims shall commence on or before the
Effective Date.  Payments shall be made by the Disbursing Agent, who is the Reorganized
Debtor, or Debtor's Counsel Ortiz & Ortiz, L.L.P., by check or upon such other terms as may
be agree upon by the Reorganized Debtor and the Claimant.  Such payments shall be made
from the Settlement Funds.  Distribution under the Plan will be sent to a Claimant's last
known address. The address will be taken from the proof of claim, if any, filed by that
Claimant with the Bankruptcy Court.  If no proof of claim was filed, the address on the
Schedules or to such other address as may be designated by a Claimant will be used.  If a
Claim is disputed by the Debtor, the Disbursing Agent shall retain in the Disbursing Account
an amount of funds sufficient to satisfy the disputed amount until the Bankruptcy Court

resolves the dispute by Final Order or the parties resolve the dispute.

       F.  <u>Treatment and Payment of Disputed Claims</u>

The Debtor or the Reorganized Debtor may file an objection to a Disputed Claim. Under the Plan, any objection must be filed no later than ninety (90) days from the Effective Date, unless the Bankruptcy Court fixes a different date.  No payments or distributions of a Disputed Claim shall be made until such dispute is resolved by a Final Order or settlement. If a Disputed Claim becomes an Allowed Claim, that claim will be paid in the same manner that other claims in its Class are paid. No payments or distributions of a Disputed Claim shall be made until such dispute is resolved by a Final Order or settlement.  In the event a Disputed Claim becomes an Allowed Claim after the first payment is made to Disputed Claimant's Class, said Allowed Claim shall be paid consistent with the payments received by holders of other Claims in the Class into which such Claim falls commencing on the next distribution date under the Plan.

<div align="center">XI. VOTING AND CONFIRMATION OF PLAN</div>

       A.  <u>Voting Procedures and Requirements</u>.  Claimants receiving a written voting ballot are entitled to vote to either accept or reject the Plan. Only Claimants deemed impaired are entitled to vote to accept or reject the Plan.  Votes must be transmitted in writing, and may not be transmitted orally.  Instructions for completing the voting ballot, and the deadline for submitting the ballot, will accompany the voting ballot. Votes must be transmitted by the voting deadline, or they will not be considered.

**The Debtor strongly urges voting Claimants to vote in favor of the Plan, so that it may continue to remain in business and continue to provide the high quality services it has provided for so many years. Therefore, the Debtor urges any Claimant with any question regarding the Plan or voting process to contact its counsel, Ortiz & Ortiz, L.L.P., 127 Livingston Street, Brooklyn, New York 11201, Tel. No. (718) 522-1117.**

B. <u>Claimants Entitled to Vote</u>. Classes One and Two are Impaired and are entitled to vote. The term "Impaired" is defined in the Plan and defined in paragraph C below. Each holder of a Claim that is not Impaired under the Plan, as defined in the Bankruptcy Code, is deemed to have accepted the Plan. Therefore, the solicitation of votes with respect to such Class for the holders of Claims of such Class is not required.

C. <u>Definition of Impairment</u>. As provided in the Plan, a Class that is Impaired is entitled to vote to accept or reject the Plan. Stated simplistically, and in non-legal terms, Claimants under the Plan that are not receiving full payment of their Claims are deemed impaired.

D. <u>Vote Required for Class Acceptance</u>: Classes of Claims that are not Impaired under a plan are deemed, as a matter of law, to have accepted the plan; they are not permitted to vote for such Plan. Only Impaired Classes may vote to accept or reject the Plan. Classes 1 and 2 are Impaired and may vote for or against the Plan. A Class is deemed to have rejected a Plan if such Plan provides that the Claims of such Class do not receive or retain any Property under the Plan on account of such Claims. No Claimants are afforded this treatment under the Plan.

An Impaired Class has accepted the Plan if more than one half of the number of votes and two thirds of the dollar amount of the voting holders of Claims in a Class have timely and properly voted to accept the Plan.

E. <u>Disclosure Statement Hearing</u>:  The Bankruptcy Court must review and approve the information contained in a Disclosure Statement before it can be sent to voting creditors.  Typically, a debtor requests such court approval after notifying its creditors that it intends to do so at a hearing before the Bankruptcy Court.  Creditors and other parties in interest are provided the opportunity to be heard on whether or not the Disclosure Statement contains adequate information before the Bankruptcy Court renders its approval of the Disclosure Statement.

In examining the Disclosure Statement, the Court determines if the Disclosure Statement contains "adequate information."  "Adequate information" is defined in the Bankruptcy Code.   By order dated _____, 2008, the Bankruptcy Court conditionally approved this Disclosure Statement as containing adequate information.  However, the Bankruptcy Court's condition approval of the information contained in the Disclosure Statement is subject to its final approval at a hearing to be held on _____, 2008. The Bankruptcy Court's conditional approval of the adequacy of the information does not mean that the Court approved the terms of the Plan.

F. <u>Requirements for Plan Confirmation</u>:  Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing").  Prior to the Confirmation Hearing, the Debtor may "solicit" creditors to vote to accept or reject the Plan. Section 1128(b) provides that any party in

interest may object to Confirmation of the Plan. At the Confirmation hearing, the Bankruptcy Court will determine whether the Plan satisfies the provisions of Section 1129 of the Bankruptcy Code. If all of the provisions of Section 1129 are satisfied, the Bankruptcy Court may enter an order confirming the Plan.

The Debtor believes that the Plan satisfies all of the requirements of Section 1129. Section 1129 provides in relevant part:

– *Applicable Law*: The plan proponent must comply with the applicable provisions of the Bankruptcy Code, including Section 1123 which specifies the mandatory contents of a plan and Section 1122 which requires that claims be placed in classes with "substantially similar" claims. See Section 1129(a)(1) and (2).

– *The Plan Must Have Been Proposed in Good Faith*: The plan must have been proposed in good faith and not by any means forbidden by law. See Section 1129(a)(3).                                             –    –

– *Disclosure of Payments*: Any payment made or to be made by the debtor or its successor, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, must be disclosed to the court and approved or be subject to the approval of the court as reasonable. See Section 1129(a)(4).

– *The Plan Must Pass the "Best Interests of Creditors" Test*: The plan must meet the "best interests of creditors" test which requires that each holder of a claim or a class of claims that is Impaired under a plan either accept the plan or receive or retain

under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code. See Section 1129(a)(7).

– *The Plan Must Receive the Requisite Amount of Impaired Votes*:  Each holder of a claim or interest in an impaired class must accept the plan.  See Section 1129(a)(8).  Alternatively, as discussed hereafter, the plan may be confirmed over the dissent of a class of impaired claims if the "cramdown" requirements of Section 1129(b) of the Bankruptcy Code are met.

 – *The Plan Must Pay Certain Claims in Full*:  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan must provide that holders of administrative expense claims and priority claims (other than tax claims) will be paid in full in cash on the effective date of the plan.  See Section 1129(a)(9).

– *At least One Impaired Class Must Vote to Accept the Plan*: At least one impaired class must accept the plan, determined without including the acceptance of the plan by any insider holding a claim in such class.  See Section 1129(a)(10).

 – *The Plan Must be Feasible*:  In other words, it cannot be likely that confirmation of the plan will be followed by the liquidation of the debtor, or the need for further financial reorganization of the debtor or of any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. See Section 1129(a)(11).

The Debtor believes that the Plan satisfies all of the applicable statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with, where applicable, all of the requirements of Chapter 11, and that the Plan is proposed in good faith. Moreover, because of the low value of the Debtor's assets, the amount of unpaid professional fees, and the fact that the Lender has a lien on all of the Debtor's assets, the Debtor believes that Class 2 creditors would receive no payment on their claims if the Debtor were liquidated, since any proceeds of such a sale would be paid to the Debtor's Professionals and the Lender. At the Confirmation Hearing, the Bankruptcy Court will determine whether the holders of each of the Impaired Claims will receive distributions under the Plan which are equal to or greater than the distributions such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. If a Claimant does not believe that the Plan satisfies all of the requirements of Section 1129 of the Bankruptcy Code, it should consult with its counsel.

G. <u>Acceptance or Cramdown</u>: As stated above, a debtor must obtain the acceptance of all voting, impaired classes of creditors in order to confirm a plan of reorganization. However, if it is unable to do so, the Court may still confirm a plan if it meets the "cramdown" provisions of Bankruptcy Code Section 1129(b) and the plan is accepted by at least one Impaired class of claims. The "cramdown" provisions require that the court find that a plan 1) "does not discriminate unfairly" and 2) is "fair and equitable" with respect to each non-accepting impaired class.

The type of claim in a class determines whether its treatment under the plan of reorganization is fair and equitable. A court may find that the plan is "fair and equitable" with respect to a class of non-accepting impaired unsecured claims only if (a) each Impaired unsecured creditor receives or retains under the plan property of a value as of the effective date of such plan equal to the amount of its allowed claim, or (b) the holder of any claim that is junior to the claims of the dissenting class will not receive or retain any property under the plan. See Section 1129(b)(2)(B). If all voting classes do not vote to accept the Plan, the Debtor will ask the Court to confirm the Plan on the basis of the cram-down provisions of the Bankruptcy Code.

In this case, if Class 2 rejects the Plan, the Debtor may have difficulty getting the Plan approved by the Court because the junior class (The Velez's shareholder interests) will retain their interest in the Debtor. But if the Debtor cannot confirm the Plan, as discussed below, it will likely shut down its business, liquidate under Chapter 7 of the Bankruptcy Code, and Class 2 creditors will probably not receive any funds. For this reason, the Debtor needs Class 2 to vote to accept the Plan.

        H. <u>Best Interests Test and Liquidation Analysis:</u> In order to find that a plan of reorganization complies with the Bankruptcy Code, a court must find that a proposed plan of reorganization is in the "best interests" of each holder of a claim in any impaired class of creditors that does not vote to accept the plan. Stated simply, a plan of reorganization satisfies the "best interests" of such creditors if the distribution under the plan of reorganization to each member of that non-accepting class equals or exceeds the distribution they would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In order to determine the value a creditor would receive under a Chapter 7 liquidation, a court must determine the aggregate dollar amount that would be available to creditors if 1) the debtor's Chapter 11 case were converted to a Chapter 7 case, and 2) all of the debtor's property and assets, as of the Filing Date, were liquidated by a Chapter 7 bankruptcy trustee (the "Liquidation Value"). Thereafter, pursuant to the terms of the Bankruptcy Code, costs such as the administrative costs incurred by the Chapter 7 trustee to conduct the liquidation, the administrative costs incurred during the Chapter 11 case by the debtor's professionals, the costs incurred by the debtor during the Chapter 11 case in the ordinary course of its business, and similar expenses are deducted from the Liquidation Value. The analysis is completed by determining the amount of the liquidation proceeds that would remain and be distributed to the holders of claims against the debtor in accordance with the priorities established by Section 507 of the Bankruptcy Code.

Under Chapter 7 of the Bankruptcy Code, Claims entitled to priority under the Bankruptcy Code must be paid in full before any distribution to general unsecured creditors occurs. Funds, if any, remaining after payment of priority claims will be distributed pro rata to general unsecured creditors. In order to ensure that the Plan meets the "best interests" test, the Debtor's accountant conducted a liquidation analysis. The liquidation analysis is annexed hereto as Exhibit 2. The liquidation analysis reveals that the holders of Claims entitled to vote on the Plan will receive a greater distribution under the Plan than under a Chapter 7 liquidation. Therefore, the Debtor believes that the Plan satisfies the "best interests" test. I. <u>Alternatives to Confirmation of Plan</u>: The Debtor believes that the Plan affords the holders of Claims the potential for the greatest payment to them and is in

the best interests of such Claim holders.  But if the Plan is not confirmed, the alternatives include: (1) continuation of the pending Bankruptcy Case, (2) an alternative plan of reorganization, (3) conversion to a Chapter 7 liquidation case, or (4) the dismissal of the pending Bankruptcy Case.

1.   *Continuation of the Case*:  Continuation of the Chapter 11 case is not in the best interest of the Debtor or its creditors and not a realistic option in this Chapter 11 case. Since the Debtor has no assets to sell, and is presently not generating income sufficient to meet its operating expenses, remaining in Chapter 11 is no longer an option.  Moreover, the Debtor has agreed to prosecute the Plan as part of the Settlement Agreement.  Finally, the Debtor believes it has been unsuccessful in its attempts to win new jobs because of its debtor in possession status. Continuing this case will surely result in the Debtor's demise. Furthermore, the longer the Debtor remains in Chapter 11, the harder it will be for the Debtor to emerge from bankruptcy because of, among other things, the professional costs of maintaining the case.

2.   *Alternative Plan of Reorganization*:  In the event the Plan is not confirmed, the Debtor or any party in interest in the Case could attempt to formulate and propose a different plan or plans. For the reasons stated above, the Debtor does not believe it can propose another plan that pays creditors a higher dividend and does not believe any other party would wish to propose a plan. It simply does not have the resources to do so.

3.   *Conversion of Chapter 11 Case to a Chapter 7 Case*:  If the case were converted to a Chapter 7 case, a trustee would be appointed to immediately close the business and auction all of the assets.  Because of the small value of the assets, after the

trustee pays the costs of liquidating the assets and closing the business, pays the chapter 7 and chapter 11 professional fees and other administrative claims, there will not be any funds available to pay any of the Claims of Class 2 Claimants.

4. *Dismissal of Chapter 11 Case*:  If the Plan is not confirmed, the Chapter 11 case can be dismissed by the Court.  Simply stated, the dismissal of the Chapter 11 case would leave the Debtor at the mercy of its creditors and most likely result in its closure.  The Debtor's Professionals and the Lender would seek payment of the Settlement Fund from the Bankruptcy Court before the case is dismissed; there would be no funds remaining for other creditors.  Without the protection of the Bankruptcy Court, the creditors must assert their claims individually against a debtor and creditors cannot benefit from the equal treatment of all similarly situated creditors provided by the Bankruptcy Code. If the Debtor stops operating, it will be forced to seek a dissolution of the corporation under state law. Therefore, although the dismissal of the Bankruptcy Case is possible, it would prove highly detrimental to the Debtor and its unsecured creditors.

## XII. TAX CONSEQUENCES OF THE PLAN

There may be federal and state tax consequences to Claimants.  EACH CLAIMANT IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN AND THE FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS.  For example, the United States Tax Code provides for non-recognition of taxable income upon the discharge of indebtedness pursuant to a confirmed plan of reorganization. Thus, any reduction of the Debtor's obligations should not be construed as income. However, it is not known if recent changes in the tax code have altered this rule. The Debtor

cannot offer tax advice to any Claimant and this Disclosure Statement should not be construed to contain any specific advice or instruction concerning the tax treatment of any claim. Each claimant is urged to consult with its own legal, accounting or other advisor concerning the tax treatment of its claim or any distribution from or on behalf of the Debtor pursuant to the Plan or otherwise.

## XIII. RECOMMENDATION AND CONCLUSION

For all of the reasons stated above, the Debtor believes that the Plan provides the best means for ensuring that Claimants will receive all or partial payment of their Allowed Claims, while helping to ensure that the Debtor survives as a productive member of the business community and employer of entertainers. THE DEBTOR STRONGLY URGES YOU TO VOTE TO ACCEPT THE PLAN.

Dated: Elmhurst, New York
Oct. 21, 2008

Andrew Velez Construction, Inc.
Debtor and Debtor-in-Possession

By: s/Andrew Velez
Andrew Velez, President

Counsel to the Debtor and Debtor-in-Possession
/s/Norma E. Ortiz
Norma E. Ortiz (NO 4748)
Ortiz & Ortiz, L.L.P.
127 Livingston Street
Brooklyn, New York 11201
Tel. (718) 522-1117

**Exhibit 1**
(Plan of Reorganization)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re

ANDREW VELEZ CONSTRUCTION, INC.          Case No.  06-12765 (MG)


                              Debtor.          Chapter 11
-------------------------------------------------------x




DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION






Dated:       Brooklyn, New York
             October 21, 2008


                              Ortiz & Ortiz, L.L.P.
                              Counsel to the Debtor and Debtor-In-
                              Possession
                              127 Livingston Street
                              Brooklyn, New York 11201
                              Tel. (718) 522-1117

# TABLE OF CONTENTS

Page

I.     ARTICLE I     Definitions and Rules of Construction........................................ 1

         1.00     Definition of Terms.................................................................... 1

         2.00     Rules of Construction.................................................................. 6

II.    ARTICLE II    Classification of Claims............................................................... 7

         2.00     Classes of Claims........................................................................ 7

III.   ARTICLE III   Voting Classes of Claims Impaired and Unimpaired................................ 7
                         Under The Plan; Class Acceptance

IV.   ARTICLE IV   Treatment of Classes Under the Plan............................................ 7

         4.00     Class 1: Lender Secured Claim.................................................. 7

         4.01     Class 2: General Unsecured Claims........................................... 8

          4.02     Class 3:  Allowed Interests of the Debtor................................... 8

V.     ARTICLE V    Treatment of Unclassified Claims ............................................ 8

         5.00     Administrative Claims ............................................................... 8

         5.01     Administrative Claims of Debtor's Professionals ..................... 9

VI.   ARTICLE VI   Identification of Classes of Claims Impaired and Unimpaired ................. 9

VII.  ARTICLE VII   Provisions Concerning Distributions........................................... 9

         7.00     Time of Distributions Under the Plan........................................ 9

         7.01     Manner of Payments Under the Plan........................................ 10

         7.02     Fractional Cents......................................................................... 10

         7.03     Unclaimed Property.................................................................. 10

         7.04     Disputed Payments or Distributions......................................... 10

VIII. ARTICLE VIII  Provisions Concerning Discharge and Property ..................... 11
                         Miscellaneous Plan Provisions

         8.00     Discharge of Claims.................................................................. 11

         8.01     Vesting of Property.................................................................... 11

IX.   ARTICLE IX   Injunction ................................................................................ 12

X.     ARTICLE X    Releases and Terminations ........................................................ 12

         10.00   Releases and Limitations of Liability Regarding the Debtor...................... 13

         10.01   Releases and Limitations of Liability Regarding Con Edison.................... 13

          10.02   Debtor's Release of the Lender.................................................. 14

          10.03   Termination of Indebtedness, Liens, and Judgments................. 14

          10.04   Rights If Plan Not Confirmed................................................... 14

          10.05   Termination of Litigation.......................................................... 14

XI.   ARTICLE XI   Treatment of Executory Contracts and Unexpired Leases.......................... 15

         11.00   Assumption and Rejection of Executory Contracts and Unexpired Leases. 15

         11.01   Cure of Defaults........................................................................ 15

         11.02   Claim for Damages................................................................... 15

         11.03   Classification of Claims............................................................ 16

XII    ARTICLE XII   Procedures for Resolving Disputed Claims or Interests............................ 16

         12.00   Time Limit for Objections to Claims or Interests....................... 16

         12.01   Resolution of Disputed Claims.................................................. 16

         12.02   Payments to Claimants with Disputed Claims........................... 16

|   |   |   |
|---|---|---|
|   | 12.03 Retention of and Enforcement of Causes of Action.................................... | 16 |
| XIII | ARTICLE XIII   Means for Execution of This Plan........................................... | 17 |
| XIV | ARTICLE XIV   Administrative Provisions........................................................ | 17 |
|   | 14.00 Further Documents and Action.................................................................. | 17 |
|   | 14.01 Automatic Stay........................................................................................ | 17 |
|   | 14.02 Fiscal Year and Effective Date For Accounting Purposes........................... | 17 |
| XV | ARTICLE XV  Retention of Jurisdiction........................................................... | 18 |
| XVI | ARTICLE XVI  Request for Application of Bankruptcy Code Section 1129(b)................ | 19 |
| XVIII | ARTICLE XVII General Provisions................................................................... | 20 |
|   | 17.00 Modification of the Plan......................................................................... | 20 |
|   | 17.01 Notice..................................................................................................... | 20 |
|   | 17.02 Headings................................................................................................. | 21 |
|   | 17.03 Severability............................................................................................. | 21 |
|   | 17.04 Governing Law........................................................................................ | 21 |
|   | 17.05 Successors and Assigns........................................................................... | 21 |
|   | 17.06 Reservation of Rights.............................................................................. | 21 |
|   | 17.07 Withdrawal, Revocation, Modification, or Amendment of Plan................. | 21 |
|   | 17.08 Binding Effect of This Plan..................................................................... | 21 |
|   | 17.09 Conflicts................................................................................................. | 22 |
| XVIII | ARTICLE XVIII   Conditions to Confirmation................................................. | 22 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

In re

ANDREW VELEZ CONSTRUCTION, INC.,          Case No.  06-12765


                            Debtor.          Chapter 11
------------------------------------------------------x


## DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

        Andrew Velez Construction, Inc., the debtor and debtor-in-possession (the "Debtor"), proposes this First Amended Plan of Reorganization (the "Plan"), pursuant to section 1121(a) the Bankruptcy Code.

## ARTICLE I

### DEFINITIONS AND RULES OF CONSTRUCTION

1.00    Definition of Terms.

1.01        <u>Administrative Claim</u>:  means a Claim for any cost or expense of administration in connection with this Bankruptcy Case of a kind specified in Sections 502(f) and 503(b) of the Bankruptcy Code and referred to in Sections 507(a)(2) and 1114 of the Bankruptcy Code, including, without limitation, any actual and necessary cost and expense of preserving the Estate of the Debtor incurred after the Filing Date and up to Confirmation; any indebtedness or obligation incurred or assumed by the Debtor in connection with the ordinary conduct of its business; allowances of compensation for legal or other professional services and reimbursement of costs and expenses under Section 330(a) or 331 of the Bankruptcy Code or otherwise allowed by the Court; all costs of making distributions and providing notices and ballots with respect to the Plan; and all fees and charges assessed against the Estate under Chapter 123, Title 28, United States Code.

1.02        <u>Administrative Creditor</u>:  means a person or entity holding an Allowed Administrative Claim.

1.03        <u>Adversary Proceeding</u>:  means the adversary proceeding commenced in the bankruptcy case under Adversary Proceeding Number 07-1706 in the U.S. Bankruptcy Court for the Southern District of New York by the Debtor against Consolidated Edison Co. Of New York, Inc., and The Switzer Group.

1.04        <u>Allowed</u>:  when used in conjunction with the Claims or Class of Claims defined in this Plan, means a Claim or portion of a Claim: (i) which is scheduled by the Debtor pursuant to Sections 521(1) of the Bankruptcy Code, other than a Claim which is scheduled by the Debtor as disputed, contingent or unliquidated; or (ii) for which proof has been filed, pursuant to Section 501(a) of the Bankruptcy Code; or (iii) any Claim allowed pursuant to this Plan and, in each such case in (i) and (ii) above, as to which either (a) no objection to the allowance thereof has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Court or (b) such an objection is so interposed and the Claim shall have been allowed by a Final Order and to the extent so allowed by the Court.  Notwithstanding the foregoing, Claims shall be Allowed to the extent that this Plan provides that they are deemed Allowed.

1.05        <u>Bankruptcy Case</u>:  means this Chapter 11 reorganization case, filed under Case No.06-12765, and commenced by the filing of the Debtor's voluntary chapter 11 petition with the Clerk of the Court on November 22, 2006.

1.06        <u>Bankruptcy Code</u>:  means Title 11 of the United States Code, 11 U.S.C. Sections 101, et seq., as amended.

1.07        <u>Bankruptcy Court or Court</u>:  means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Bankruptcy Case.

1.08        <u>Bankruptcy Rules</u>:  means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, together with all amendments and modifications from time to time made thereto as prescribed under 28 U.S.C. Section 2075.

1.09        <u>Business Day</u>:  means any day other than a Saturday, Sunday or a "legal holiday," and as that term is defined in Bankruptcy Rule 9006.

1.10        <u>Cash</u>:  means cash and cash equivalents, including but not limited to, bank deposits, checks and other similar items and the Settlement Funds.

1.11        <u>Chapter 11</u>:  means Chapter 11 of the Bankruptcy Code.

1.12        <u>Claim</u>:  Any right to a payment from the Debtor, whether or not such right is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable in nature, or secured or unsecured; and a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right is reduced to

judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.13        <u>Claimant</u>:  means the holder of a Claim.

1.14        <u>Class</u>:  means a category of holders of Claims as provided for in Article II of this Plan.

1.15        <u>Con Edison</u>:  means the Consolidated Edison Company of New York, Inc.

1.16        <u>Con Edison Stipulation</u>:  means the Stipulation and Release of Claims entered into among the Debtor, Con Edison, and The Switzer Group, Inc., that settled the Adversary Proceeding and was so-ordered by the Bankruptcy Court by order dated August 15, 2008.  A copy of the Con Edison Stipulation is annexed hereto as Exhibit A.

1.17        <u>Confirmation</u>:  means the entry of an order by the Court confirming this Plan in accordance with Chapter 11.

1.18        <u>Confirmation Date</u>:  means the date upon which the Court enters an order confirming this Plan in accordance with Chapter 11.

1.19        <u>Confirmation Order</u>:  means the order entered by the Court confirming this Plan in accordance with Chapter 11.

1.20        <u>Debtor</u>:  means Andrew Velez Construction, Inc., as a debtor-in-possession.

1.21        <u>Debtor's Professionals</u>:  means the following professional firms: Ortiz & Ortiz, L.L.P., Debtor's Counsel, Arent Fox, LLP, former Special Counsel, and Castellano, Korenberg, & Co., the Debtor's accounting firm.

1.22        <u>DIP Account</u>:  means the bank account established by the Debtor as its Debtor-in-Possession bank account in this Bankruptcy Case.

1.23        <u>Disallowed Claims</u>:  means any Claim or portion thereof that has been disallowed by the Court by a Final Order.

1.24        <u>Disbursing Account</u>:  means the bank account that will be established after the Confirmation Date to disburse the payments provided for in the Plan.

1.25        <u>Disbursing Agent</u>:  means the Reorganized Debtor or its designated agent, who shall maintain the Disbursing  Account.

1.26    Disclosure Statement:   means the disclosure statement, as may be amended or modified, that (I) relates to this Plan and (ii) as approved by the Bankruptcy Court under Section 1125 of the Bankruptcy Code, to the extent necessary.

1.27    Disputed Claims:   means (I) a Claim which is scheduled by the Debtor as disputed, contingent or unliquidated, or (ii) any Claim that is not Allowed, or (iii) any Administrative Claim filed by or asserted by a Professional or any other Administrative Creditor to which the Debtor files an objection with the Court, or (iv) any Claim which has been filed pursuant to Section 501(a) of the Bankruptcy Code and as to which an objection to the allowance thereof has been or will be interposed within the time limitation fixed by the Bankruptcy Code, by an order of the Court, or by this Plan, which objection has not been determined, in whole or in part, by a Final Order.

1.28    Effective Date:   means the date selected by the Debtor after Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions specified in the Plan have been satisfied or waived by the Debtor.

1.29    Estate:   means the estate created in this Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

1.30    Executory Contracts:   means executory contracts and unexpired leases as described in Section 365 of the Bankruptcy Code.

1.31    Filing Date:   means November 22, 2006, the date the Debtor filed its voluntary bankruptcy petition with the Clerk of the Court.

1.32    Final Order:   means an order, ruling, or judgment that is in full force and effect, is not stayed, and is no longer subject to review, reversal, modification, amendment,  appeal, or writ of certiorari.

1.33    General Unsecured Claim:   means any Claim other than a Priority Claim, a Priority Tax Claim, or an Administrative Claim.

1.34    Impaired:   means any Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.35    Lender:   means, collectively, Hudson Valley Bank, as successor in interest to New York National Bank, the Business Consortium Fund, Bank Hapoalim, and City National Bank of New Jersey.

1.36    Lender Claims:   means, collectively, the Lender Secured Claim and the Lender Unsecured Claim.

1.37        <u>Lender Collateral</u>:   means all of the assets of the Estate subject to the Lien of the Lender under the Pre-Petition Loan Documents.

1.38        <u>Lender Secured Claim</u>:   means the Claim belonging to the Lender secured by the Lender's Collateral.

1.39        <u>Lender Stipulation</u>:  means the Stipulation and Release of Claims that may be entered into among the Lender and the Debtor that may be so-ordered by the Bankruptcy Court.

1.40        <u>Lender Unsecured Claim</u>:   means the Claim belonging to the Lender, in addition to the Lender Secured Claim, in the amount of Five Hundred Thirteen Thousand One Hundred Eighty Two Dollars ($513,182.00).

1.41        <u>Lien</u>:   shall have the meaning ascribed to such term in Bankruptcy Code Section 101(37).

1.42        <u>Plan</u>:   means this Chapter 11 Plan of Reorganization or as may be further amended or modified.

1.43        <u>Pre-Petition Loan Documents</u>:   means collectively (i) the Interest Bearing Grid Note dated March 29, 2002, in the original principal amount of $1,500,000 (as amended, restated, supplemented, or otherwise modified from time to time) (the "Note") which evidenced a $1,500,000 line of credit (the "Loan"), (ii) a Security Agreement-Assignment of Monies Due or to Become Due Under Contract or Sub-Contract Dated March 29, 2002 (as amended, restated, supplemented, or otherwise modified from time to time) (the "Assignment"), and (iii) a Continuing General Security Agreement dated March 29, 2002 (as amended, restated, supplemented, or otherwise modified from time to time) (the "Security Agreement"), and (iv) an Agreement of Modification of Loans dated September 14, 2005 (the "Modification Agreement"), and (v) all other agreements, instruments, and documents at any time executed and delivered in connection with the Loan, Assignment, and Modification Agreement, each as amended, restated, or supplemented or otherwise modified from time to time.

1.44        <u>Priority Tax Claim</u>:   means any Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.45        <u>Professional or Professionals</u>:   means any professional person or entity as defined by Section 327(a) of the Bankruptcy Code.

1.46        <u>Property</u>:   means the Debtor's collective interest in all of its personal property, or in which the Debtor has an interest, including the Debtor's DIP Account, its

furniture and fixtures, good will, and all causes of action to which the Debtor reserves the right to assert as the Reorganized Debtor, if any.

1.47     Record Date:   means the last date fixed pursuant to a Final Order of the Bankruptcy Court for the purpose of voting with respect to this Plan.

1.48     Reorganized Debtor:   means the Debtor immediately following the date upon which the Confirmation Order becomes a Final Order.

1.49     Schedules: means the schedules of assets and liabilities filed in the Bankruptcy Court in the Bankruptcy Case, as have been and may be further amended.

1.50     Settlement Funds: means the proceeds of the settlement of the Adversary Proceeding.

1.51     Unclaimed Property:   means any Cash that is unclaimed within sixty days after such Cash is distributed, and shall include: (I) checks, and the funds represented thereby, that have been returned as undeliverable; (ii) funds for checks that have not been paid or negotiated; and (iii) checks, and the funds represented thereby, that were not mailed or delivered because of the absence of a proper address to which to mail or deliver same.

1.52     Unsecured Tax Claim:   means any tax Claim that is a general unsecured Claim.

2.00   Rules of Construction

        For the purposes of this Plan, the following terms shall have the respective meanings as hereinafter set forth.  Such meanings are equally applicable to the singular and plural forms of the terms defined, unless the context requires otherwise.  Capitalized terms used in this Plan shall at all times refer to the terms as defined in this Article I.  A capitalized term used in this Plan which is not defined herein but is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules.  The words "herein", "hereof" and "hereunder" and other words of similar import refer to this Plan as a whole, including all exhibits and schedules, if any, annexed hereto, as the same may from time to time be amended or supplemented, and not to any particular article, section or subdivision contained in this Plan.

# ARTICLE II

## CLASSIFICATION OF CLAIMS

Claims are classified below pursuant to Bankruptcy Code section 1122. Administrative Claims and Priority Taxes have not been classified, pursuant to Bankruptcy Code section 1123(a)(1), and are treated in Article V of the Plan.

2.0     Classes of Claims.

2.01        Class 1 consists of the Lender Secured Claim.

2.02        Class 2 consists of All General Unsecured Claims, including Unsecured Tax Claims and the Lender Unsecured Claim.

2.03        Class 3 consists of the equity interest holders Lois Velez and Andrew Velez.

# ARTICLE III

## VOTING CLASSES OF CLAIMS IMPAIRED AND UNIMPAIRED UNDER THE PLAN; PLAN ACCEPTANCE

3.00        Any Class of Claimants impaired under the Plan is entitled to vote to accept or reject this Plan. Pursuant to Bankruptcy Code section 1126©, a Class of Claims shall have accepted the Plan if at least two thirds in amount and more than one half in number of the Claimants that timely and properly voted to accept or reject the Plan in fact voted to accept the Plan. Classes 1 and 2 are impaired and entitled to vote to accept or reject the Plan.

# ARTICLE IV

## TREATMENT OF CLASSES UNDER THE PLAN

4.00        Class 1:  Lender Secured Claim:  The Lender Secured Claim shall be deemed an Allowed Claim in the amount of Seventy-Five Thousand Dollars ($75,000.00). Subject to the terms herein, and unless the holder of the Lender Secured Claim agrees to receive other less favorable treatment, on or before the Effective Date, subject to Court approval and the Lender Stipulation, such holder of an Allowed Claim in this Class shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Claim, the sum of Seventy Five Thousand

Dollars ($75,000) from the Settlement Funds.  Such payment shall satisfy in full the Lender Secured Claim.

4.01        Class 2:  General Unsecured Claims

In full and final satisfaction of all Allowed General Unsecured Claims, each Claimant in Class 2 shall receive a pro rata distribution of Twenty-Five Thousand Dollars ($25,000) of the Settlement Funds on the Effective Date or as soon thereafter as practical.  The Lender Unsecured Claim of the Lender shall be deemed an Allowed Claim in the amount of Five Hundred and Thirteen Thousand One Hundred and Eighty Two Dollars ($513,182.00) and shall be deemed a General Unsecured Claim.

4.02        Class 3:   Allowed Shareholder Interests

The Class Three Shareholders, Andrew and Lois Velez, shall receive no payment

or distribution of money or property under the Plan. The Class Three Shareholder's legal, contractual and equitable rights shall not be altered, changed or modified and shall retain their respective interests in the Reorganized Debtor.


**ARTICLE V**

TREATMENT OF UNCLASSIFIED CLAIMS

5.00        Administrative Claims

Administrative Creditors, other than the Claims of Professionals, shall receive on the Effective Date, or as soon as practicable thereafter, either a) Cash equal to one hundred percent of such Claimant's Allowed Administrative Claim, or b) payment on such other terms as may be agreed upon by such Claimants and the Debtor. The Administrative Claims that are incurred after the Confirmation Date shall be paid by the Reorganized Debtor when due or as soon as practicable thereafter, at the option of the Reorganized Debtor, without an order of the Court, subject to the provisions of the Plan.  Any Claim for an indebtedness or obligation incurred or assumed by the Debtor in connection with the ordinary conduct of its business shall be paid pursuant to the terms and conditions of the transaction giving rise to such Claim.

All quarterly fees due to the United States Trustee shall be paid in full by the Confirmation Date.  All quarterly fees that accrue thereafter will be paid by the Reorganized Debtor until the Bankruptcy Court enters a final decree.

5.01     Administrative Claims of Debtor's Professionals

The Claims of Debtor's Professionals shall be fixed by the Court pursuant to Bankruptcy Code section 330. The Allowed Claims of Debtor's Professionals accrued on or prior to the Effective Date shall be paid by the Debtor pursuant to the terms of any agreement entered into between the Professional and the Debtor and/or pursuant to Court Order. Any fees incurred by the Debtor's Professionals subsequent to the Effective Date shall be paid by the Reorganized Debtor. Once the Claims of Professionals are determined by Court Order, the Debtor shall distribute Eighty-Five Thousand Dollars ($85,000.00) from the Settlement Funds on or before the Effective Date, pursuant to Court Order, to satisfy those claims. The balance of the fees awarded by the Court will be paid in full pursuant to Court Order, or pursuant to an agreement between the Reorganized Debtor and the Professionals, but in no event later than 20 months from the Effective Date.

## ARTICLE VI

### IDENTIFICATION OF CLASSES OF CLAIMS IMPAIRED AND NOT IMPAIRED

6.00     Each Class of Claims that is Impaired may vote for or against the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Each Class of Claims that is unimpaired is deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Classes 1 and 2 are impaired by the Plan.

## ARTICLE VII

### PROVISIONS CONCERNING DISTRIBUTIONS

7.00     Time of Distributions Under the Plan.

Class One and Class Two Claimants shall be paid in full on or before the Effective Date, or soon thereafter, from the Settlement Funds. The Claims of the Debtor's Professionals shall be paid Eighty-Five Thousand Dollars ($85,000.00) from the Settlement Funds pursuant to Court Order as soon as practicable. The balance of the Claims of the Debtor's Professionals will be paid pursuant to Court Order entered by the Court pursuant to 11 U.S.C. § 330 and or by agreement with the Debtor's professionals but, in no event, later than 20 months from the Effective Date.

7.01     Manner of Payments Under the Plan.

Payments to be made by the Debtor pursuant to this Plan shall be made by check from an attorney escrow account held by Debtor's Counsel Ortiz & Ortiz, L.L.P. and from the Debtor's Debtor-in-Possession account. Any payments due to creditors subsequent to the Effective Date shall be made by the Reorganized Debtor as may be agreed upon by the Reorganized Debtor and the Claimant.

7.02     Fractional Cents.

Any other provision of this Plan to the contrary notwithstanding, no payments of fractions of cents will be made. Whenever any payments of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent.

7.03     Unclaimed Property.

Except as otherwise provided herein, in the event and at such time as any distribution under this Plan becomes Unclaimed Property, then the person or entity to which such distribution was to have been made shall forfeit all rights thereto, and to any and all future payments under the Plan, and the Claim in respect of which such distribution was to have been made shall be treated as a Disallowed Claim not subject to Section 502(j) of the Bankruptcy Code. In this regard, distribution to Claimants entitled thereto shall be sent to their last known address set forth on a proof of claim filed with the Court or if no proof of claim is filed, on the schedules filed by the Debtor, or to such other address as may be designated by a Claimant pursuant section 17.02 of the Plan.

7.04     Disputed Payments or Distributions.

In the event of any dispute between or among Claimants as to the right to receive or retain any payment or distribution to be made to such entity or person under this Plan, including the entity or person asserting the right to receive the disputed payment or distribution, the Disbursing Agent shall retain in the Disbursing Account an amount of funds sufficient to satisfy the disputed amount, until the entry of a Final Order resolving the dispute or until the parties to such dispute may agree otherwise.

# ARTICLE VIII

## PROVISIONS CONCERNING DISCHARGE AND PROPERTY

8.00    <u>Discharge of Claims</u>.

Except as otherwise provided in this Plan and the Confirmation Order, and subject to the occurrence of the Effective Date, the rights afforded in this Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any Claim that arises before the Confirmation, against the Debtor, the Reorganized Debtor, its past and present agents, or its assets or Property, including any debt of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(I), whether or not such Claim is Allowed, and whether or not the Holder of such Claim has voted on this Plan or voted to accept or reject this Plan.

Except as otherwise provided in this Plan and the Confirmation Order, and subject to the occurrence of the Effective Date, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release of all Claims and Causes of Action against, liabilities of, liens on, charges, encumbrances, security interests, obligations of and interests in the Debtor and the Reorganized Debtor and any property of the Debtor and the Reorganized Debtor, whether known or unknown, regardless of whether a proof of Claim was filed, whether or not Allowed and whether or not the Holder of the Claim has voted on this Plan, or voted to accept or reject this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim.

8.01    <u>Vesting of Property</u>.

To the extent not provided herein, on the Effective Date, title to the Property of the Debtor not distributed to Creditors or placed in the Disbursing Account shall vest in the Reorganized Debtor and be assumed by the Reorganized Debtor after the Effective Date, or shall be conveyed or distributed under this Plan free and clear of all Claims of Creditors, except as otherwise provided in this Plan. Except as otherwise provided in this Plan, Confirmation of this Plan shall be binding and the Debtor's debts shall be discharged as provided in section 1141 of the Bankruptcy Code.

# ARTICLE IX

## EFFECT OF THE PLAN ON CLAIMS

9.00      <u>Injunction</u>.

In implementation of the discharge provided in Section 8.01 hereof, except as otherwise expressly provided in this Plan (including obligations in respect of Claims as at the Effective Date and including Section 8.01 hereof), the Confirmation Order shall provide, among other things, that all entities or persons who have held, hold, or may hold Claims, including Claims that arise before Confirmation, against the Debtor are permanently enjoined on and after the Effective Date: (i) from commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind with respect to any such Claim against the Debtor or the Reorganized Debtor, its past or present agents, or Property of the Debtor or the Reorganized Debtor (ii) from the enforcement, attachment, collection or recovery by any manner, directly or indirectly, of any judgment, award, decree, or order against the Debtor or the Reorganized Debtor or the Property of the Debtor, with respect to any such Claim, (iii) from creating, perfecting or enforcing, directly or indirectly, any encumbrance of any kind against the Debtor, or against the Property of the Debtor with respect to any such Claim, (iv) from asserting, directly or indirectly, any set off, right of subrogation, or recoupment of any kind against any obligation due the Debtor and (v) from any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan.  Nothing in this Plan shall (a) prohibit the holder of a timely filed Claim to which the Debtor has timely filed an objection from litigating its right to seek to have such Claim declared an Allowed Claim or (b) enjoin or prohibit the enforcement by any Claimant of any of the obligations of the Debtor or Reorganized Debtor under this Plan.  Nothing in the Plan shall be construed as affecting or discharging the personal liability of the officers and shareholders of the Debtor or Reorganized Debtor for any debts discharged pursuant to the Plan, including any liability for federal, state, and local taxes.

# ARTICLE X

## RELEASES AND TERMINATION

10.00    <u>Releases and Limitations of Liability Regarding the Debtor</u>

On or after the Confirmation Date, no officer, director, or agent of the Reorganized Debtor, or any attorney, accountant, or professional employed by any of those persons (collectively, "Exculpated Persons"), shall have or incur any liability to any person or entity for any Claim arising from any past or present

actions taken or omitted to be taken under or in connection with, related to, effecting, or arising out of the Debtor's operations after the Petition Date or the Chapter 11 Case, the pursuit of Confirmation, and the formulation, preparation, dissemination, implementation, administration, Confirmation, or consummation of the Plan and accompanying Disclosure Statement, including the making of any payments under the Plan or taking any other actions in connection with the Plan.

All persons, holders of Claims, entities, and parties-in-interest receiving payments under the Plan may not assert a Claim against such Exculpated Persons for any and all causes of action arising out of or in connection with the Reorganized Debtor's discharge of the powers and duties conferred upon it by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan or applicable law.  Such exculpation shall not apply to actions or omissions arising out of gross negligence or willful misconduct.  No current holder of a Claim or Representative thereof shall have or pursue any cause of action (i) against the Reorganized Debtor for making payments in accordance with the Plan, or for implementing the provisions of the Plan, or (ii) against any holder of a Claim for receiving or retaining Distributions or other payments as provided for by the Plan.  The release provided herein does not extend to any personal liability of the Debtor's or Reorganized Debtor's officers and shareholders for Claims, including any claims for federal, state, and local taxes.

10.01     Releases and Limitations of Liability Regarding Con Edison

On the Effective Date, to the fullest extent permissible under applicable law (as such applicable law may be extended after the Effective Date), in consideration for the distributions received under the Plan, each entity that has received any such distribution, including the Lender, will be deemed to forever release, waive and discharge Con Edison and its shareholders, members, officers, directors, employees, representatives, consultants, architects, engineers, contractors (including, without limitation, S. DiGiacomo & Son, Inc.), inspectors, attorneys, agents, affiliates, and any entity or person who furnished materials or provided services in connection with the design, construction or completion of the construction project at Con Edison's property located at 222 1st Street, Brooklyn, New York (the "Project") (collectively, the "Con Edison Released Parties") from any and all claims, demands, obligations, change order or extra work requests, causes of action, suits, accounts, liens, debts, assignments, invoices, damages and liabilities, of any nature whatsoever, whether known or unknown, whether sounding in tort, contract or otherwise, whether anticipated or unanticipated, whether contingent or matured, both in law and in equity which such entity had, now has, or may have in the future, arising from or in any way relating to the Project or any work performed in connection therewith that are based in whole or in part on any act or omission, event or occurrence taking place on or prior to the Effective Date.  The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity that will have received distribution

under the Plan, whether directly or indirectly, of any claim, suit, demand, cause of action or liability release by the preceding sentence.

10.02    Debtor's Release of the Lender

The Debtor, on its own behalf and on behalf of its predecessors, successors, and assigns, irrevocably and unconditionally fully, finally, and forever releases and discharges Lender and all of the predecessors, subsidiaries and affiliates of the Lender, and all of the present and former directors, officers, employees, financial advisors, attorneys, agents, successors and assigns of the Lender and such predecessors, subsidiaries and affiliates (collectively, the "Releasees"), any and all demands, claims, liabilities, responsibilities, disputes, actions, or cause of action (whether at equity or law) and obligations of any nature whatsoever, whether liquidated or unliquidated, known or unknown, matured or unmatured, fixed or contingent, which each ever had, now has, or may ever have, or claim to have, now or in the future against the Releasees, or any of them, arising at any time from the beginning of the world through the Effective Date.

10.03    Termination of Indebtedness, Liens, and Judgments.

Except as otherwise provided for in this Plan, upon the Effective Date, all instruments evidencing indebtedness of the Debtor impaired by the Plan shall be deemed canceled as against the Debtor, including any and all liens or judgments obtained against the Debtor for any Claim that arose prior to the Confirmation Date.

10.04    Rights If Plan Not Confirmed.

If Confirmation of this Plan does not occur, this Plan shall be deemed null and void, and in such event nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other entity or to prejudice in any manner the rights of the Debtor or any entity in any further proceedings involving the Debtor, and no statement contained in this Plan shall constitute an admission of any fact by the Debtor in any further proceedings involving the Debtor.

10.05    Termination of Litigation.

Any motion or adversary proceeding commenced against the Debtor regarding the Debtor or its Property shall be deemed dismissed with prejudice as part of the Plan, including the Adversary Proceeding.

**ARTICLE XI**

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.00        <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.

All Executory Contracts to which the Debtor is a party are deemed assumed by the Reorganized Debtor as of the Effective Date, except those Executory Contracts listed in Exhibit B to this Plan, in accordance with Bankruptcy Code Section 365. If applicable, Exhibit B shall be served upon all parties to the rejected Executory Contracts prior to the Effective Date. The Executory Contracts listed in Exhibit B to the Plan are deemed rejected pursuant to Bankruptcy Code section 365. The Debtor and the Reorganized Debtor shall have the right, at any time prior to ninety days after the Effective Date, to amend Exhibit B; any Executory Contract added to or deleted from Exhibit B will be assumed or rejected, respectively as of the date of such amendment.

11.01        <u>Cure of Defaults</u>.

All payments that may be required to cure any default under an Executory Contract that is assumed under this Plan under Bankruptcy Code Section 365(b)(1) shall be made by the Debtor or the Reorganized Debtor. In the event of a dispute regarding the amount of any cure payment, the ability of the Reorganized Debtor to provide adequate assurance of future performance, or any other matter pertaining to the assumption, the Debtor or the Reorganized Debtor shall make such cure payments required by Code Section 365(b)(1) following the entry of a Final Order resolving such dispute. The Reorganized Debtor shall cure all other defaults existing under any Executory Contract which is assumed under this Plan.

11.02        <u>Claim for Damages</u>.

Any party to an Executory Contract that is rejected pursuant to Section 11.01 shall be entitled to file, no later than thirty days after such rejection, a proof of claim for damages alleged to arise from the rejection of such Executory Contract. Objections to any proof of claim shall be filed by the Debtor or Reorganized Debtor no later than sixty days after such proof of claim is filed, and the Court shall resolve any such objections. Payment of such Claim shall be made on the later of (i) ten Business Days after the expiration of the ninety-day period for filing an objection to such proof of claim filed and (ii) ten Business Days after the Claim has been Allowed by a Final Order, provided that no such payments shall be made before the Effective Date.

11.03    Classification of Claims.

Allowed Claims arising out of the rejection of an Executory Contract shall be Class 2 Claims.

# ARTICLE XII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS

12.00    Time Limit for Objections to Claims or Interests.

Objections to Disputed Claims shall be filed by the Debtor or Reorganized Debtor with the Court and served upon each holder of each of the Claims and Interests to which objections are made not later than ninety (90) days subsequent to the Effective Date or within such other time period as may be fixed by the Court.

12.01    Resolution of Disputed Claims.

The Reorganized Debtor is authorized to litigate to judgment, settle, or withdraw objections to Disputed Claims, or negotiate and accept different terms with holders of Allowed Claims in its sole discretion.

12.02    Payments to Claimants with Disputed Claims.

Payments and distributions to each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall be made in accordance with the provisions of this Plan with respect to the Class of Creditors to which the holder of such Allowed Claim belongs.  No payments or distributions of a Disputed Claim shall be made until such dispute is resolved by a Final Order or settlement.  In the event that the Effective Date occurs prior to the sixtieth day after the Confirmation Date and a distribution is not made on the Effective Date to a Creditor, that Creditor shall be deemed to hold a Disputed Claim.  In the event a Disputed Claim becomes an Allowed Claim after the first Effective Date's first payment, said Allowed Claim shall be paid consistent with the payments received by holders of other Claims in the Class into which such Claim falls commencing on the next distribution date under the Plan.

12.03    Retention of and Enforcement of Causes of Action

The Reorganized Debtor shall retain the exclusive right to exercise its discretion to enforce against any person or entity any and all Causes of Action of the Debtor, including all Causes of Action of a trustee or debtor-in-possession under the Bankruptcy Code, other than those Claims or Causes of Action released or compromised under this Plan.

# ARTICLE XIII

## MEANS FOR EXECUTION OF THIS PLAN

13.00   The Debtor and the Reorganized Debtor shall satisfy its obligations from the Cash it maintains on hand on the Effective Date and the Settlement Funds.


# ARTICLE XIV

## ADMINISTRATIVE PROVISIONS

14.00   Further Documents and Action.

On or before the Effective Date, the Debtor is authorized to file with the Bankruptcy Court such agreements and other documents, and take or cause to be taken such action, as may be necessary or appropriate to effect and further evidence the terms and conditions of this Plan.

14.01   Automatic Stay.

The Debtor and all of the Debtor's Property shall be subject to the exclusive jurisdiction of the Bankruptcy Court until such time as the Plan is fully effectuated.  Until such time as all such Property has been distributed in accordance with this Plan and this case is closed pursuant to Section 362(c)(2)(A) of the Bankruptcy Code, all such Property shall be protected by the automatic stay under Section 362(a) of the Bankruptcy Code.

14.02   Fiscal Year and Effective Date For Accounting Purposes.

The Reorganized Debtor's fiscal year end shall be deemed, for accounting and tax purposes, September 30th.  The Effective Date of the Plan shall be deemed, for tax and accounting purposes, as September 30, 2008.

# ARTICLE XV

## RETENTION OF JURISDICTION

15.00     Retention of Jurisdiction.

Following the Confirmation Date, the Court shall retain jurisdiction of this proceeding and of all matters arising under or out of the Bankruptcy Case, including, without limitation, for the following purposes:

15.00.1     to hear and determine any objections to the allowance of Claims;

15.00.2     to determine any and all applications for compensation for Professionals;

15.00.3     to determine any and all pending applications for the rejection or assumption or for the assumption or assignment, as the case may be, of Executory Contracts to which the Debtor is a party or with respect to which it may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom or to resolve any dispute regarding the assumption, rejection or alleged defaults of the Unexpired Leases or Executory Contracts;

15.00.4     to determine any and all applications, adversary proceedings, and contested or litigated matters before the Court and pending on or made after the Confirmation Date, including adversary proceedings to collect the Debtor's Property and claims of the Debtor;

15.00.5     to modify this Plan pursuant to Section 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistency in the  Confirmation Order;

15.00.6     to hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of this Plan, the Confirmation Order, and any other documents executed and delivered in connection with this Plan;

15.00.7     to hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Court in the Bankruptcy Case and any and all controversies and disputes arising under, or in connection with, this Plan;

15.00.8     to adjudicate all controversies concerning the classification of any Claim;

15.00.9 to liquidate damages in connection with any disputed, contingent or unliquidated Claims;

15.00.10 to adjudicate all Claims, the security thereof or ownership in any Property of the Debtor or in any proceeds thereof;

15.00.11 to recover all assets and Property of the Debtor wherever located, including the prosecution and adjudication of all causes of action available to the Reorganized Debtor;

15.00.12 to determine all questions and disputes regarding recovery of and entitlement to the Debtor's Property and determine all claims and disputes between the Debtor, and any other Entity, whether or not subject to an action pending as of the Confirmation Date;

15.00.13 to enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary or appropriate;

15.00.14 to enter an order or final decree closing and terminating the Bankruptcy Case; and

15.00.15 to enter an order, after notice and a hearing, determining the appropriate amount of compensation due to professionals;

15.00.16 to make such orders as are necessary or appropriate to carry out the provisions of this Plan, including but not limited to orders interpreting, clarifying or enforcing the provisions thereof and/or the Confirmation Order.

## ARTICLE XVI

## REQUEST FOR APPLICATION OF BANKRUPTCY CODE SECTION 1129(b)

16.00 In the event a Class of Creditors is deemed to be Impaired and does not accept the Plan, the Debtor hereby requests to amend the Plan and have the Bankruptcy Court find that the provisions of this Plan provide fair and equitable treatment to all Classes and that the Plan is in the best interest of the creditors of the Debtor and that the Bankruptcy Court confirm this Plan, notwithstanding the requirements of Section 1129(a)(8) of the Bankruptcy Code.

**ARTICLE XVII**

GENERAL PROVISIONS

17.00      <u>Modification of the Plan</u>.

The Debtor reserves the right, in accordance with the Bankruptcy Code, to seek to withdraw, amend or modify this Plan before or after the Confirmation Date.

17.01      <u>Notice</u>.

All notices, requests, elections or demands in connection with this Plan, including any change of address of any Claimant for the purposes of receiving distributions under this Plan and forfeiting same pursuant to Section 7.04 hereof, shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and if sent to the Debtor, addressed to:

Andrew Velez, President
Andrew Velez Construction, Inc.
74-16 Grand Avenue
East Elmhurst, New York 11373

and with a copy to:

Norma E. Ortiz, Esq.
Ortiz & Ortiz, L.L.P.
127 Livingston Street
Brooklyn, New York 11201

All notices and requests to Claimants or holders of Interests of any Class shall be sent to them at their last known address. The Debtor, and any Claimant and holder of Interest of any Class, may designate in writing any other address for purposes of this Section, which designation shall be effective upon receipt.

17.02     Headings.

The headings used in this Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the provisions of this Plan.

17.03     Severability.

Should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Plan.

17.04     Governing Law.

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York.

17.05     Successor and Assigns.

The rights and obligations of any entity or person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

17.06     Reservation of Rights.

Nothing contained herein shall prohibit the Debtor or Reorganized Debtor from prosecuting or defending any of its rights as may exist on its own behalf.

17.07     Withdrawal, Revocation, Modification, or Amendment of Plan.

The Debtor reserves the right to revoke, withdraw, modify, or amend this Plan at any time prior to or subsequent to the entry of the Confirmation Order, as permitted by the Bankruptcy Code and Bankruptcy Rules.

17.08     Binding Effect of this Plan.

This Plan shall be binding upon and inure to the benefit of the Reorganized Debtor, any person or entity bound by the provisions of this Plan under Bankruptcy Code section 1141, and their respective predecessors, successors, assigns, agents, partners, officers, and directors.

7.09   <u>Conflicts</u>.

    The terms of the Plan shall control in the event there is any conflict, inconsistency, or discrepancy between the Plan and Disclosure Statement.

## ARTICLE XVIII

<u>CONDITIONS TO CONFIRMATION</u>

(a)  The Confirmation Order shall have become a Final Order.

(b)  All requirements of any federal, state or local laws, ordinances or regulations that must be satisfied in connection with the consummation of the Plan shall be satisfied.

Dated: Brooklyn, New York
    Oct. 21, 2008

          by:   <u>*s/Andrew Velez*</u>
               Andrew Velez, President
               Andrew Velez Construction, Inc.
               74-16 Grand Avenue
               East Elmhurst, New York 11373

Counsel to the
Debtor and Debtor-in-Possession

<u>*s/Norma E. Ortiz*</u>
Norma E. Ortiz (NO 4748)
Ortiz & Ortiz, L.L.P.
127 Livingston Street
Brooklyn, New York 11201
Tel. (718) 522-1117

**Exhibit A**
(Con Edison Stipulation)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re

ANDREW VELEZ CONSTRUCTION, INC.,   Case No.  06-12765 (MG)


         Debtor.    Chapter 11
-------------------------------------------------------X
ANDREW VELEZ CONSTRUCTION, INC.

        Plaintiff,    Adv. Proc. No. 07-01706 (MG)


   - against -

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC. and
THE SWITZER GROUP, INC.

        Defendants
-------------------------------------------------------X

## STIPULATION OF SETTLEMENT AND RELEASE OF CLAIMS

   This settlement agreement and release of claims (the "Agreement") by and among

Andrew Velez Construction, Inc., as debtor and debtor-in-possession (the "Debtor") in the

above-captioned bankruptcy case (the "Case"), Consolidated Edison Company of New York,

Inc. ("Con Ed"), and The Switzer Group, Inc. ("Switzer" and, together with Con Ed, the

"Defendants") sets forth the terms and conditions upon which the Debtor and the Defendants

(collectively referred to as the "Parties") have agreed to settle certain issues that have arisen in

the Case.

## RECITALS

   1.  Con Ed is the fee owner of the real property located at 222 1st Street, Brooklyn,

New York (the "<u>Property</u>"), commonly known as Con Ed's Third Avenue Yard Facilities.

2.     On or about October 4, 2001, Con Ed and the Debtor entered into a written agreement known as Purchase Order No. 128355 (as modified and supplemented from time to time, the "<u>Contract</u>"), whereby Velez agreed to furnish certain work, labor, supervision, services, materials and equipment, and act as the general contractor to renovate and reconstruct the Property (the "<u>Project</u>").  The Contract was modified, inter alia, by the Modification Implementing Settlement and Release, dated June 29, 2006.

3.     Switzer performed architectural services in connection with the Project.

4.      The Debtor entered into subcontracts with various subcontractors and suppliers (the "<u>Subcontractors</u>") for certain work, labor, services and material to be furnished by such Subcontractors.  Many of the Subcontractors eventually filed mechanics' and similar liens against the Property (the "<u>Liens</u>").

5.     On November 22, 2006, before the Project was completed, the Debtor filed the Case in the U.S. Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").  The Debtor has managed its affairs pursuant to Bankruptcy Code sections 1107 and 1108.

6.     In December 2006, Con Ed moved the Court for, among other things, an order compelling the Debtor to assume or reject the Contract pursuant to Bankruptcy Code Section 365.  An order rejecting the Contract was entered by the Court on January 31, 2007.

7.     On or before September 25, 2007, Con Ed filed a timely proof of claim in the Case  ("<u>Claim No. 30</u>") asserting claims for damages based on the Debtor's anticipated rejection of the Contract in an aggregate liquidated amount of $18,960,535 plus further unliquidated amounts.  Claim No. 30 consists of amounts expended and to be expended by Con Ed on the

completion of the Project, including the costs of retaining another general contractor to complete the Project, as well as amounts expended on redeeming certain of the Liens.

8.     Upon redeeming some of the Liens, Con Ed received an assignment of the proofs of claim filed by those Subcontractors that had filed such Liens against the Property (the "Assigned  Claims" and together with Claim No. 30, "Con Ed's Claims").

9.     On or about June 5, 2007, the Debtor commenced the above-captioned adversary proceeding against the Defendants (the "Adversary Proceeding").  In its Amended Complaint, the Debtor has asserted a variety of causes of action against each Defendant and sought substantial damages.  Each Defendant filed an Answer in the Adversary Proceeding, (a) Con Ed asserting substantial counterclaims against the Debtor and (b) Switzer asserting certain cross claims against Con Ed (the "Cross-Claim").  References hereafter to the Adversary Proceeding shall include the Cross-Claim, and all other claims, counterclaims and cross claims  (collectively, the "Adversary Proceeding Claims") asserted by the Parties against one another in the Adversary Proceeding, including all Adversary Proceeding Claims that were dismissed, all Adversary Proceeding Claims that survived motions to dismiss, and all Adversary Proceeding Claims that could have been brought as part of the Adversary Proceeding.

10.    Thereafter, the Parties engaged in an effort to settle the Adversary Proceeding, including formal mediation between the Debtor and Con Ed that took place on February 20, 2008.

11.    The Debtor is in need of funds to satisfy its operating expenses in order to remain operational, as well as to fund a plan of reorganization in the Case (the "Plan").

12.    In consideration of the mutual promises, covenants, and obligations set forth

below, and for other good and valuable consideration as stated herein, the sufficiency of which is hereby acknowledged, the Parties agree and stipulate as follows:

## AGREEMENT

13. The recitals set forth above are incorporated herein by reference.

14. On or as soon as practicable after the Agreement Effective Date (as defined below), in full and final satisfaction of all claims asserted by the Debtor in the Adversary Proceeding, Con Ed shall transfer to the Debtor's account indicated to it by the Debtor Two Hundred and Eighty-Five Thousand Dollars ($285,000.00) (the "Settlement Amount"), to be used by the Debtor to fund the Plan. The Debtor intends to utilize the Settlement Amount as follows:

  a.   Seventy-Five Thousand Dollars ($75,000.00) to pay the claims of the Debtors' prepetition bank lenders;

  b.   Twenty-five Thousand Dollars ($25,000.00) to pay the claims of all general unsecured non-priority creditors.

  c.   One Hundred and Ten Thousand Dollars ($110,000.00) to pay the cost of insurance premiums and related operational costs.

  d.   Seventy-five Thousand Dollars ($75,000.00) to pay the Debtor's court-retained professionals for fees and expenses incurred.

15. The Settlement Amount shall represent final payment in accordance with Article 4(G) of Con Ed's Standard Terms and Conditions of Construction Contracts, which are incorporated into the Contract.

16. Upon the Agreement Effective Date, (a) the Amended Complaint shall be deemed

automatically withdrawn, and the Adversary Proceeding (and all Adversary Proceeding Claims, including, without limitation, the Cross-Claim) shall be deemed to be dismissed with prejudice and without costs to any Party, and (b) all mechanics liens filed by the Debtor against the Property shall be automatically released.  Notwithstanding the foregoing, the Debtor shall make all the necessary filings to (a) have the Adversary Proceeding dismissed and (b) have the foregoing liens released.

17.     Con Ed (a) agrees to vote the full amount of the Con Ed's Claims in favor of the Plan and (b) subject to the occurrence of the Agreement Effective date, waives its right to receive any distribution on account of the Con Ed's Claims under the Plan.

18.     The Debtor shall include in any Plan it will submit to the Court, as consideration for Con Ed's funding of the Plan,  a provision providing a full and complete release of the Con Ed Released Parties (as defined below) by all parties receiving any distribution under the Plan and an injunction prohibiting any such parties from bringing any claims or causes of action against the Con Ed Released Parties.  The Debtor shall (a) submit for Con Ed's prior approval any language in the Plan to this effect, and (b)  make every effort to obtain the confirmation of the Plan containing such release and injunction.

19.     The Parties understand and acknowledge that this Agreement is subject to Court approval and shall become final and binding upon the Parties only on the Agreement Effective Date.  The Debtor agrees to promptly file a motion seeking the Court's approval of the Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019.

20.     This Agreement shall become effective on the first date (the "Agreement Effective Date") on which an order of the Court approving the Agreement shall have become

final and not subject to appeal, certiorari, or further review. In the event this Agreement is not approved by the Court, it shall become null and void.

21.     As of the Agreement Effective Date, Con Ed, Switzer, and their respective representatives, agents, and affiliates release and forever discharge the Debtor and its shareholders, members, officers, directors, employees, members, representatives, agents and affiliates forever from all claims, whether known or unknown, whether sounding in tort, contract or otherwise, whether anticipated or unanticipated, whether past or present, both in law and in equity arising from or relating to the Assigned Claims, Claim No. 30, the Adversary Proceeding Claims, and the Project, except for the Debtor's obligations under this Agreement.

22.     As of the Agreement Effective Date, the Debtor and its officers, principals, shareholders, representatives, agents, and affiliates waive, release and forever discharge Con Ed and its shareholders, members, officers, directors, employees, representatives, consultants, architects, engineers, contractors (including, without limitation, S. DiGiacomo & Son, Inc.), inspectors, attorneys, agents, affiliates, and any entity or person who furnished materials or provided services in connection with the design, construction or completion of the Project (collectively, the "Con Ed Released Parties"), and Switzer and its shareholders, members, officers, directors, employees, representatives, agents and affiliates (the "Switzer Released Parties") from any and all claims, demands, obligations, change order or extra work requests, causes of action, suits, accounts, liens, debts, assignments, invoices, damages and liabilities, of any nature whatsoever, whether known or unknown, whether sounding in tort, contract or otherwise, whether anticipated or unanticipated, whether contingent or matured, both in law and in equity which Velez had, now has, or may have in the future, arising from or relating to the

Contract, the Project, any work performed in connection therewith, and the Adversary

Proceeding, except for Con Ed's and Switzer's obligations under this Agreement.

23.     As of the Agreement Effective Date, Switzer releases Con Ed from any and all

claims underlying the Cross-Claim.  Nothing in this Agreement shall be deemed to release,

remise, discharge, impair, waive. abrogate, prejudice or interfere in any way with the respective

rights and obligations each of them otherwise may have under (a) Purchase Order 519016,

together with any modifications thereof, and/or (b) the Joint Defense, Privilege and Tolling

Agreement executed by Switzer and Con Ed in October 2007.  Except for the Cross-Claim (that

is being dismissed with prejudice), Switzer and Con Ed each fully retains any claims and causes

of action they may otherwise have against each other in connection with the Project.

24.     The Court shall retain jurisdiction for the purpose of enforcing the

terms of this Agreement.  The Parties agree that the premises and undertakings set forth herein

shall be specifically enforceable.

25.     Each Party expressly recognizes that the consideration set forth herein

is given by each Party in settlement of a contested matter and that neither this Agreement, the

consideration specified herein, the acceptance thereof nor any other action taken in connection

with this Agreement represents an admission of liability or responsibility on the part of any Party

nor shall be so admissible.  Each Party agrees that it is compromising claims on which the fact,

liability and damages are hotly disputed, and that it has considered the likelihood of success were

it to litigate such claims, the costs of such litigation, its business reasons for entering into this

Agreement, including, without limitation, the concern that litigation would divert management

from other business activities, and in light of the foregoing and other considerations, has

determined that the consideration it is receiving under this Agreement is valuable, fair, and reasonably equivalent to the consideration it is giving.

26.     The Parties acknowledge that no promise, inducement, or agreement not stated herein has been made to them in connection with this Agreement, and that this Agreement constitutes the entire agreement among them with respect to the subject matter hereof.  The Parties understand and agree that this Agreement may not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a writing expressly stating that it is modifying this Agreement, duly executed by all Parties and approved by the Court.

27.     This Agreement may be executed simultaneously or in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  A facsimile copy of a signature page is the equivalent of an original signature page.

28.     This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of New York, when state law is applicable and not preempted by federal bankruptcy law, without giving effect to the provisions, policies, or principles thereof relating to choice of law or conflict of laws.

29.     Each Party represents and warrants to the other Parties that (a) it has the sole right and authority to compromise and/or surrender the claims and causes of action that are the subject of this Agreement and that it has not sold, assigned, transferred, conveyed, pledged or otherwise disposed of such claims and/or causes of action, (b) the person signing this Agreement on behalf of such Party has the authority to execute this Agreement on behalf of such Party and to bind that Party to all terms and conditions set forth herein,  and (c) it was represented by counsel of its choice in negotiating and drafting this Agreement, and no ambiguity in or dispute about the

meaning of any language in this Agreement shall be presumptively construed against the drafter, and each Party shall be considered to have participated in the drafting.

30.     This Agreement shall be binding on any and all successors and assigns of each Party, including, without limitation, any trustee that may be appointed in the Case or in any chapter 7 case to which the Case may be converted.

**IN WITNESS WHEREOF**, this Agreement is executed as of the 16th day of June, 2008.

<div style="margin-left:50%">

Andrew Velez Construction, Inc.

By: _/s/ Norma E. Ortiz_____
Title: Attorney-in-fact
Dated: July 17, 2008


Consolidated Edison Company of New York, Inc.

By: _/s/ Lena Mandel_____
Title: Attorney -in-fact
Dated: June 19, 2008


The Switzer Group, Inc.

By: _/s/ Michele Moshe_____
Title:  Attorney
Dated: July 8, 2008

</div>

SO ORDERED:

August 15, 2008
New York, NY

/s/ Martin Glenn_____
United States Bankruptcy Judge

**Exhibit B**
(List of Executory Contracts and Leases)

## List of Executory Contracts and Leases

None

**Exhibit 2**
(Liquidation Analysis)

Andrew Velez Construction, Inc.
(Debtor In Possession)
Balance Sheet
30-Jun-08

|  |  | Liquidation Value |
| --- | --- | --- |
| Current Assets: |  |  |
| Cash | 2,500 | 2,500 |
| Construction Management Fees Receivable | 241,013 | 50,631 |
| Deferred Tax Charge | 13,700 | 0 |
| Prepaid Expenses and other Current Assets | 22,333 | 0 |
| Total Current Assets | 279,546 | 53,131 |
| Property and Equipment, Net of Accumulated Depreciation of $ 68,856 | 3,753 | 200 |
| Assets Subject to Compromise: |  |  |
| Contract Receivables, Net of Overbillings | 3,822,249 | 275,000 |
| Other Assets: |  |  |
| Deferred Tax Charge | 55,000 | 0 |
| Deposits | 45,938 | 0 |
| Total Other Assets | 100,938 | 0 |
| Total Assets | 4,206,486 | 328,331 |

See accountants' compilation report.

Current Liabilities:

| | |
|---|---:|
| Current Maturities of Note Payable | 107,508 |
| Accounts Payable | 92,942 |
| Income Taxes Payable | 300 |
| Accrued Expenses and Other Current Liabilities | 162,877 |
| | |
| Total Current Liabilities | 363,627 |

Long Term Liabilities:

| | |
|---|---:|
| Loan Payable-Related Party | 50,000 |
| Loans Payable- Stockholder | 452,381 |
| | |
| Total Long Term Liabilities | 502,381 |

Liabilities Subject to Compromise:

Secured:

| | |
|---|---:|
| Note Payable-Bank | 568,750 |

Unsecured:

| | |
|---|---:|
| Trade Accounts Payable | 2,761,044 |

Stockholders' Equity:

| | |
|---|---:|
| Common Stock | 50,000 |
| Additional Paid In Capital | 278,683 |
| Accumulated Deficit | (317,999) |
| | |
| Total Stockholders' Equity | 10,684 |
| | |
| Total Liabilities and Stockholders' Equity | 4,206,486 |